IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DALILIA WRIGHT, *o/b/o* D.Y. | ) ) ) | CASE NO. 1:12-CV-2536 |
| Plaintiff, | ) ) | |
| v. | ) ) ) | MAGISTRATE JUDGE KENNETH S. McHARGH |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) | MEMORANDUM OPINION & ORDER |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 13). The issue before the undersigned is whether the final decision of the Commissioner of Social Security (the "Commissioner") denying Dalilia Wright's ("Plaintiff" or "Wright") application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq.*, on behalf of D.Y., is supported by substantial evidence and therefore, conclusive. For the reasons set forth below, the undersigned AFFIRMS the Commissioner's decision.

### I.      INTRODUCTION & PROCEDURAL HISTORY

On January 8, 2009, Plaintiff applied for Supplemental Security Income benefits on behalf of D.Y. (Tr. 21, 73). Plaintiff alleged D.Y. became disabled on January 1, 2006, due to suffering disruptive behavior disorder. (Tr. 97, 123). The Social Security Administration denied Plaintiff's application initially and upon reconsideration. (Tr. 75-80). Thereafter, Wright requested and was granted a hearing before an administrative law judge ("ALJ") to contest the denial of the application for benefits. (Tr. 81).

On May 5, 2011, Administrative Law Judge Ben Barnett convened a hearing to evaluate the application. (Tr. 38-59). Plaintiff and D.Y., along with counsel, appeared before the ALJ.

(*Id*.). No expert witnesses were present at the hearing. (Tr. 38). On July 8, 2011, the ALJ issued an unfavorable decision denying Plaintiff's request for benefits. (Tr. 21-33). D.Y. was born on September 30, 1998, and was 12 years old at the time of the ALJ's determination. (Tr. 73). Accordingly, D.Y. was a "school-age child" at the time the application was filed and an "adolescent" when the ALJ rendered his decision. *See* 20 C.F.R. 416.926a(g)(2)(iv)-(v).

Subsequently, Wright sought review of the ALJ's decision from the Appeals Council. (Tr. 16). The Appeals Council took into account the additional evidence submitted with Plaintiff's appeal; however, the council still denied Plaintiff's request, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). Plaintiff now seeks judicial review of the Commissioner's denial pursuant to 42 U.S.C. § 1383(c).

## II.    SUMMARY OF THE ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on September 30, 1998. Therefore, she was a school-age child on January 8, 2009, the date the application was filed, and is currently an adolescent.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3. The claimant has the following severe impairments: disruptive behavior disorder, attention deficit hyperactivity disorder, and mood disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings.

6. The claimant has not been disabled, as defined in the Social Security Act, since January 8, 2009, the date the application was filed.

(Tr. 24-33) (internal citations omitted).

### III. STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i). Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the child claimant is working. If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. An impairment can equal the listings medically or functionally. 20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings. The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings. These domains include:

>  (1) Acquiring and using information;
>  (2) Attending and completing tasks;
>  (3) Interacting and relating with others;
>  (4) Moving about and manipulating objects;
>  (5) Caring for yourself; and,
>  (6) Health and physical well-being.

3

20 C.F.R. § 416.926a(b)(1). In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains. 20 C.F.R. § 416.926a(d).

> The regulations define "marked" and "extreme" impairments:
>
>> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.
>
> 20 C.F.R. § 416.926a(e)(2)(i).
>
>> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.
>
> 20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record. 20 C.F.R. § 416.927. A treating physician's opinions should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for the weight actually assigned to such opinions. *Id*. The ALJ must also account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record. 20 C.F.R. § 416.927(e)(2)(i-ii). Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's

4

teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age. 20 C.F.R. § 416.926a(b)(3)(i-ii).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards. Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984). "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence. See Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981). Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. Id. While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute would be decided differently, or if substantial evidence also supports the opposite conclusion. The Commissioner's decision, if supported by substantial evidence, must stand. See Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986); Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. See Garner, 745 F.2d at 387. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. See Walker v. Sec'y of Health & Human Servs., 884 F.2d 241, 245 (6th Cir. 1989).

5

## V. ANALYSIS

Plaintiff challenges the ALJ's decision on primarily two grounds. Wright contends the ALJ erred by failing to complying with the treating source doctrine when analyzing the opinions of D.Y.'s treating psychiatrist. Additionally, Plaintiff submits that the ALJ erred by failing to find that D.Y.'s impairments functionally equaled listing level. For the reasons set forth below, neither of these objections warrants remand or reversal.

### A. Whether the ALJ properly analyzed D.Y.'s treating psychiatrist's opinions

Psychiatrist Susan Frodyma, M.D., first treated D.Y. in February 2010. (Tr. 451-55). After conducting a mental status examination, Dr. Frodyma recorded unremarkable findings and described D.Y. as cooperative and euthymic. (Tr. 453-55). The doctor diagnosed ADHD and mood disorder (nos) and prescribed Adderall. (Tr. 455).

The evidence that was before the ALJ indicates that D.Y. had approximately five follow-up appointments with Dr. Frodyma over the course of fourteen months. (Tr. 431-51). On April 14, 2010, the psychiatrist noted that D.Y. had written notes relating to suicide, but did not have a plan or the desire to harm herself. (Tr. 447, 450). For "irritability and anger," Dr. Frodyma prescribed Prozac. (Tr. 450). Dr. Frodyma also recalled that D.Y. felt Adderall was helping. (*Id.*). In May 2010, Dr. Frodyma reported that D.Y. "is doing better on medication. She is more calm, better able to concentrate at school, [and] getting along better with peers and family." (Tr. 446). Dr. Frodyma also observed D.Y. as happy. (Tr. 445). In November 2010, Dr. Frodyma found that Plaintiff was doing well with concentration and had an improved mood. No side effects from medications were noted. (Tr. 442). On January 26, 2011, Dr. Frodyma wrote that there was "room for improvement," but D.Y. was otherwise improved in terms of concentration and mood. (Tr. 438). During an April 13, 2011 session, D.Y.'s parents reported that the increase

6

in medication had helped with D.Y.'s mood, concentration, and outbursts. (Tr. 431). Dr. Frodyma again noted progress in concentration, attention, and mood. (Tr. 434).

On April 13, 2011, Dr. Frodyma completed a medical source statement assessing D.Y.'s functional limitations. (Tr. 427-30). The doctor opined that D.Y. had "marked" limitations in the areas of acquiring and using information, attending and completing tasks, interacting and relating with others, and moving about and manipulating objects. Dr. Frodyma found "moderate" limitations in the domains of caring for self and health and physical well-being. The psychiatrist stated that D.Y. is easily distracted; has difficultly acquiring and learning new information, especially in math; is unable to maintain attention in all of her classes; and cannot complete tasks, tests, or homework. (Tr. 427-28).

Plaintiff points out that Dr. Frodyma completed a second medical source statement on September 14, 2011. (Tr. 458-61). However, when the ALJ rendered his decision on July 8, 2011, he did not have the second treating source statement before him. (Tr. 33). The Appeals Council found that this medical source statement would not have served as a basis for changing the ALJ's decision and denied Plaintiff's request for review. (Tr. 2, 5). "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148-49 (6th Cir. 1996) (*citing Cotton v. Sullivan,* 2 F.3d 692, 695-96 (6th Cir. 1993)). Although the district court can remand the case for further administrative proceedings in light of the new evidence under 42 U.S.C. § 405(g), Plaintiff does not argue that a remand is necessary due to new evidence. Accordingly, the Court must limit its review to the evidence that was before the ALJ and will not consider Dr. Frodyma's opinion from September 2011.

7

It is well-established that the opinion of a treating source must be given controlling weight if it is well-supported and not inconsistent with other evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 416.927. When an ALJ determines that the opinions of a treating source are not supported by medically acceptable clinical and laboratory diagnostic techniques or are inconsistent with other evidence in the record, the ALJ must apply specific factors to determine how much weight to afford the opinion. 20 C.F.R. § 416.927. These factors include the length of the treatment relationship, the frequency of examination, the supportability of the opinion, and the consistency of the opinion with the record as a whole. *Id.* The regulations also demand the ALJ to provide good reasons for the weight actually given to the opinion. *Id.*

Here, it is clear that Dr. Frodyma was a treating source based on the nature of her treatment relationship with D.Y. Nevertheless, the ALJ's decision to give "little weight" to Dr. Frodyma's findings of marked limitations from the April 2011 medical source statement was not in error. (Tr. 26). The ALJ explained that he did not attribute controlling weight to the psychologist's April 2011 medical source statement, because the opinion was not supported by clinical findings. (Tr. 27). The ALJ then went on to provide good reason for devaluing Dr. Frodyma's opinion. Specifically, the ALJ wrote: "Dr. Frodyma's treatment notes show that the conditions of ADHD and mood disorder are controlled with medication and do not support finding marked impairments in any domain." (*Id.*). Within that same paragraph, the ALJ provided a detailed discussion of Dr. Frodyma's treatment notes from every treatment session the psychologist conducted with D.Y. As the ALJ correctly observed, Dr. Frodyma's treatment notes do not support the psychologist's assignment of marked limitations. For example, Dr. Frodyma regularly indicated D.Y. had improvement with medication, specifically in regard to

8

her concentration and mood. Additionally, in January 2011, though D.Y.'s mother claimed D.Y. was having extreme problems academically in seventh grade, D.Y.'s reports to Dr. Frodyma were to the contrary. (Tr. 27, 435). D.Y. told the psychiatrist, that aside from math, she was doing well in school, getting along with peers and siblings, and was involved in a program where she taught younger students math, social studies, and science. (*Id.*). On April 13, 2011, the same day that Dr. Fordyma completed her treating source statement, D.Y.'s parents reported D.Y. had a better mood and concentration due to medication, that D.Y.'s grades had improved, and they were concerned about D.Y.'s weight gain. (Tr. 431-34). Dr. Frodyma check boxes on her form indicating that D.Y. had decreased impulse control and frustration tolerance, but also noted improvement in those areas. (*Id.*). Dr. Frodyma otherwise reported no other significant concerns regarding D.Y. (*Id.*). Given the unremarkable findings recorded in Dr. Frodyma's treatment notes and the pattern of improvement that they demonstrate, the ALJ reasonably concluded that they failed to support the marked limitations Dr. Froydma opined to in her treating source statement. As a result, the ALJ was not required to adopt Dr. Frodyma's findings of marked limitations.

Plaintiff also contends that the ALJ erred by failing to apply the factors denoted in 20 C.F.R. 416.927(c) when determining the weight he attributed to Dr. Frodyma's opinion. However, Plaintiff has not identified, and the Court is unaware of, any binding case law demanding an ALJ to specify how he analyzed each of these factors individually. The regulations only require the ALJ to provide "'good reasons . . . for the weight . . . given to the treating source's opinion'—not an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (*citing* 20 C.F.R. § 404.1527(d)(2)) (alterations in original). The "good reasons" requirement only demands that the ALJ *consider* the factors

provided in 20 C.F.R. § 416.927.  *Blanchard v. Comm'r of Soc. Sec.*, No. 11-CV-12595, 2012 WL 1453970, at *16-17 (E.D. Mich. Mar. 16, 2012), *R&R adopted* 2012 WL 1432589.  While including a thorough assessment of each factor might be helpful in assisting a claimant to better understand the ALJ's decision, so long as the ALJ's opinion clearly conveys why the doctor's opinion was credited or rejected, the ALJ has satisfied his burden.  *Francis*, 414 F. App'x at 804.  Given that the ALJ clearly articulated why he chose to attribute less than controlling weight to Dr. Frodyma's opinion, his opinion sufficiently complied with the mandates of the treating source rule.

Wright also maintains that the ALJ erred in granting greater weight to the opinions of state agency reviewing consultants, Drs. Chambly and Khan, than to those of her treating source. (Tr. 27, 316-21, 357-62).  Plaintiff cites to *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983) for the proposition that the opinion of a consultative physician cannot constitute substantial evidence to overcome the properly supported opinions of a treating source. In the present case, however, the ALJ reasonably concluded that opinions in Dr. Frodyma's treating source statement were not properly supported.  Thus, the ALJ was not required to defer to the psychologist's opinions over those of other medical opinions of record.

In a further attack on the ALJ's attribution of weight between Dr. Frodyma and the state agency consultants, Plaintiff argues that a medical consultant's opinion cannot be afforded greater weight than a treating physician's opinion, when the consultant's opinion was based on a review of an incomplete case record.  Plaintiff asserts that the state agency reviewing consultants issued their opinions in 2009, while Dr. Frodyma's opinions were provided only a few months before the 2011 hearing.   In making this argument, Plaintiff cites *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009), where the Sixth Circuit held that the ALJ's decision to

accord greater weight to state agency physicians over the plaintiff's treating sources was reversible error, because the consultants' opinions were based on an incomplete case record. The Sixth Circuit emphasized that granting great weight to a state agency consultative examiner over a treating source, on its own, was not reversible error. *Id.*  Nonetheless, the ALJ needed to indicate some awareness that the consultants' review was based on an incomplete case record, missing almost 300 pages of medical records, before the ALJ deferred to the expert's opinion. *Id.*

In accordance with *Blakely*, the ALJ acknowledged that the state agency doctors did not have all of D.Y.'s records when they formulated their opinions.  The ALJ wrote that the consultants "reviewed available records in April and September 2009 and concluded that the claimant has less than marked impairment in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself." (Tr. 27).  Thus, the ALJ signaled his awareness was that the consultants' reviews were not comprehensive.

*Blakley* is further distinguishable based on the facts of the present case.  In *Blakley*, the ALJ failed to adequately explain the weight given to a number of the claimant's treating physicians.  *Id.* at 407-09.  Here, the ALJ made it clear that he gave little weight to Dr. Frodyma's findings and expressly provided good reasons for doing so.  As a result, the ALJ did not attempt to circumvent the treating physician rule.  Thus, the overriding danger that existed in *Blakely*—that the ALJ discounted treating source assessments without good reason and instead relied on the opinions of consultants who did not review the entire record—is not at issue here. *See Kail v. Colvin,* 5:13-CV-00838, 2014 WL 173184 (N.D. Ohio Jan. 13, 2014).  Accordingly, the ALJ's decision to attribute greater weight the state agency opinions over those of D.Y.'s treating source does not mandate remand.

11

**B. Whether D.Y. functionally equaled the listings**

Wright argues that the ALJ erred by finding that D.Y. did not functionally equal a listing, because the evidence supports the opposite conclusion. The ALJ found that D.Y. had less than marked limitations in all domains, and thus failed to meet the requirements for functional equivalency.  In order to "functionally equal" the listings, a child claimant's impairment or combination of impairments must result in "marked" limitations in two domains or "extreme" limitations in one domain.  20 C.F.R. § 416.926a(d).  Plaintiff alleges that, contrary to the ALJ's determination, D.Y. has marked limitations in the following domains: (1) attending and completing tasks; (2) interacting and relating with others; and (3) caring for oneself.  Plaintiff's argument is without merit.  After a review of the evidence that was before the ALJ, the Court concludes that substantial evidence supports the ALJ's finding that D.Y. had "less than marked" limitations in the disputed domains.

**1. Attending and completing tasks**

This domain examines how well the child is able to focus, maintain attention, and begin, carry through and finish activities.  20 C.F.R. § 416.926a(h).  It also measures the child's pace in completing activities and the ease with which the child is able to change activities. *Id*.  Examples of limited functioning in this domain include: repeatedly becoming sidetracked or frequently interrupting others; being slow to focus on, or fail to complete activities of interest to you (like games); and requiring extra supervision to remain engaged in an activity.  20 C.F.R. § 416.926a(h)(3)(i)-(v).  Importantly, "the regulation cautions that just because a person has the limitations described does not mean the person has an extreme or even a marked impairment." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009) (*citing* 20 C.F.R. § 416.926a(h)(3)).  Thus, the fact that a claimant's behaviors may coincide with the examples in the regulations does not require a court to overturn the ALJ's finding.

12

While evaluating D.Y.'s ability in the domain of attending and completing tasks, the ALJ acknowledged that Ms. Baldassar, D.Y.'s sixth grade teacher, reported D.Y. had below average ability to independently and complete assignments on time, (Tr. 29, 421-22), and Ms. Booker, a fifth grade teacher noted D.Y. "needed to improve" her ability to work independently. (Tr. 29, 425).  Nonetheless, in finding less than marked limitations, the ALJ in part relied on the opinions of both state agency reviewers, who opined to the same. (Tr. 318, 359).  Following the state agency reviews, D.Y. began treatment with Dr. Frodyma and taking medication.  The ALJ observed that this intervention resulted in improvement:  reports from D.Y.'s parents and Dr. Frodyma showed D.Y. was calmer and better able to concentrate at school. (Tr. 27).  D.Y. communicated that she was doing well in seventh grade, aside from math. (*Id.*).  Accordingly, substantial evidence supports the ALJ's conclusion that despite D.Y. having some problems in attending and completing tasks, she did not have marked limitations in this domain.

Wright notes that teachers' reports from February 2012, when D.Y. was in the eighth grade, support a finding of marked limitations. (Tr. 248-57).  These records were not before the ALJ, and the appeals counsel declined to conduct an additional review even with these records.  As a result, the undersigned cannot consider this evidence.

**2.  Interacting and relating with others**

This domain examines how well a child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others and complies with rules.  20 C.F.R. § 416.926a(i).  Examples of limitations in this area include: when the child has no close friends, has difficulty playing games or sports with rules, or has difficulty communicating with others or speaking intelligibly.  20 C.F.R. § 416.926a(i)(3)(i-vi).

Regarding D.Y.'s ability to interact and relate to others, the ALJ acknowledged that Ms. Baldassar, Ms. Booker, and D.Y.'s therapist found some difficulties in relation to D.Y.'s ability to interact with peers and her teachers. (Tr. 30). However, the ALJ also pointed to sufficient evidence showing that D.Y. was not markedly limited in this domain. The ALJ noted that Michael Leach, Ph.D., a clinical psychologist who examined D.Y. at the request of the state agency in March 2009, found D.Y. was happy, interacted well, remained polite, and gave good effort. (Tr. 24, 312-13). Moreover, after beginning treatment with Dr. Frodyma, the record indicates that D.Y. was getting along better with peers and family. (Tr. 27, 446). D.Y. had also become involved in a program teaching younger students. (*Id.*). Testimony from D.Y.'s mother revealed that D.Y. goes to school activities, like dances, and that she wished to sign up for softball. (Tr. 26, 48). The ALJ also relied on the state agency reviewing consultants, who assigned less than marked limitations in D.Y.'s interacting and relating with others. (Tr. 318, 359). A review of the record indicates that the ALJ's decision in this domain has substantial support.

### 3. Caring for self

This domain considers how well a claimant maintains a healthy emotional and physical state; how she copes with stress and changes in the environment; and whether she takes care of her own health, possessions, and living area. 20 C.F.R. § 416.926a(k). Examples of limited functioning in this domain may include: not dressing or bathing appropriately for one's age, engaging in self-injurious behavior, failing to spontaneously pursue enjoyable activities or interests, or a disturbance in eating or sleeping patterns. *Id.*

Substantial evidence supports the ALJ's finding that D.Y. has less than marked limitations in her ability to care for herself. The ALJ acknowledged that D.Y. may resist doing

chores, but she was clean in appearance by reports from record sources. (Tr. 32, 422, 424). The ALJ observed that D.Y. had written a few notes alluding to suicide, but according to Dr. Frodyma D.Y. denied any desire to harm herself. (Tr. 27). Plaintiff does not point to medical records that were actually before the ALJ that show D.Y.'s medications caused her to experience appetite or sleep loss. As Plaintiff points out, fifth and sixth grade teachers and Dr. Frodyma reported D.Y. had difficulties handling frustration. Even so, records reveal that medication and intervention with Dr. Frodyma, which began when D.Y. was half way through her sixth grade year, helped to ameliorate D.Y.'s difficulties. The undersigned finds no error in the ALJ's conclusion that D.Y. had less than marked limitations in this domain.

### 4. Behavioral Assessment Evaluation

In June 2009, Jennifer Haberkorn, M.Ed., a psychologist at D.Y.'s school, conducted an assessment of D.Y. that examined her academic achievement, cognitive ability, communicative status, motor skills, and social and emotional functioning. (Tr. 200-205, 346-51). One component of this evaluation was a behavior assessment, which was designed to facilitate diagnosis of emotional and behavioral disorders in children. The behavior assessment consisted of two sets of findings: one set was based on Ms. Booker's evaluation of D.Y. in the classroom and a second set of findings was based on D.Y.'s self-reports. (Tr. 203-04). Haberkorn warned that because Ms. Booker's responses revealed inconsistency and frequent use of absolute terms like "almost always" and "never" in describing D.Y., the scores based on her reports should be considered cautiously. (Tr. 204).

Plaintiff argues that D.Y.'s performance on the behavioral assessment evaluation serves as evidence of marked limitations in the three domains previously discussed in this opinion. Ms. Booker's responses ranked D.Y. in the ninety-seventh percentile for problems with hyperactivity

and D.Y's self-report placed her in the ninety-eighth percentile for attention problems. Plaintiff equates these two results with a marked limitation in attending and completing tasks. D.Y. fell into the first percentile for social skills under Ms. Booker's report, which Plaintiff connects to a marked limitation in interacting with others. Ms. Booker's responses also placed Plaintiff in the third percentile for adaptability, which Plaintiff argues results in a marked limitation in caring for one's self.

To support this argument, Plaintiff cites to 20 C.F.R. 416.926a(e)(2)(iii), which provides that the Commissioner "will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score." Plaintiff also points to *Duran v. Barnhart*, 01 CIV. 8307(GWG), 2003 WL 103003, at *10 (S.D.N.Y. Jan. 13, 2003), which explained that the percentage of a group that scores two or more standard deviations below the mean in normally distributed data (which is the sort of data expected on a standardized test) represents only 2.3% of the population. *Duran* adds: "In other words, in a group of 100 children evaluated in a domain, only the worst performing two children would be considered to have a 'moderate' limitation under the definition. The remaining 98 children would not have a 'moderate' limitation." *Id.* The regulations explain that the Commissioner should not rely on any test score alone to establish whether an applicant has a marked limitation in a domain; the ALJ ought to consider other information about functioning in conjunction with test scores. 20 C.F.R. 416.926a(e)(4).

Based on a review of the testing data, it does not appear that simply because D.Y. was ranked in some extreme percentiles that her test scores necessarily met the criteria for a

16

"marked" limitation under the regulations. (Tr. 203).  For example, in the areas of adaptability and social skills, D.Y.'s results fell into the third and first percentiles, but Haberkorn indicated that these results were not actually "clinically significant." (Tr. 204). Clinically significant scores suggested a high level of maladjustment. (*Id.*).  If the scores were not demonstrative of a high level of maladjustment, it does not follow that those scores would establish D.Y. fell into the bottom percentage of the population in terms of difficulties in those areas.  Additionally, Haberkorn's cautionary warning regarding the test results derived from Ms. Booker's responses calls into question the reliability of the reports and reliance on them as a basis for finding marked limitations.  Accordingly, Plaintiff has not established that the test scores provide a factual basis for a finding of marked limitations.

Moreover, the ALJ's opinion sufficiently showed why he chose not to find marked limitations despite the results.  In his opinion, the ALJ gave special attention to the conclusions of D.Y.'s school evaluation team. (Tr. 26).  The evaluation team took into account the information from the behavioral assessment evaluation, along with the additional testing performed by Haberkorn, to conclude that D.Y. did not present with evidence of a learning disability. (Tr. 26, 205, 351).  According to the team report, D.Y. had average cognitive ability, grade appropriate literacy skills, and some weaknesses in math that should be addressed through intervention.  While D.Y. had trouble working independently, displayed task avoidant behaviors, and struggled to follow directives, the team suggested that D.Y. could benefit from a behavior support program and intervention. (*Id.*).  Based on these relatively moderate conclusions and taking into account other evidence in the record, the ALJ reasonably found that D.Y was not markedly limited in any domain as Plaintiff asserts the test scores suggest.  After Haberkorn

conducted the 2009 evaluation, D.Y. demonstrated improvement with intervention, as documented by the ALJ. This improvement also undermines the import of the test results.

In summary, the ALJ found D.Y.'s symptoms were under control with medication and any limitation retained failed to constitute a disability with the meaning of the regulations. Substantial evidence supports the conclusion that D.Y.'s limitations in the areas Plaintiff contests were not marked. Importantly, even if the evidence cited by Plaintiff were sufficient to demonstrate that D.Y.'s impairments satisfied the functional equivalency criteria, the relevant question is not whether there is evidence to support a ruling different than that reached by the ALJ. The undersigned must determine whether the substantial evidence in the record supports the ALJ's decision. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). If such support exists, the undersigned must affirm the ALJ's determination. *Id.* This is because the Social Security regulations recognize that there will generally be a "zone of choice within which the decisionmaker[ ] can go either way, without interference by the courts." *Id.* (*quoting Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). While Plaintiff may disagree with the ALJ's findings with regard to D.Y.'s impairments and satisfaction of the criteria, the Court finds the ALJ's conclusions to be within the "zone of choice."

## VI. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence. Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh<br>
Kenneth S. McHargh<br>
United States Magistrate Judge

Date: <u>February 21, 2014.</u>